# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

VERONICA WOLFE, individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

AMDOCS, INC., THE INVESTMENT COMMITTEE OF AMDOCS, INC., and JOHN DOES 1-10,

        Defendants.

**CIVIL ACTION NO.:**

## CLASS ACTION COMPLAINT

Plaintiff, Veronica Wolfe ("Plaintiff"), by and through her attorneys, on behalf of the Amdocs, Inc. 401(k) Plan (the "Plan"),[1] herself and all others similarly situated, states and alleges as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Amdocs, Inc. ("Amdocs" or "Company"), and the Investment Committee of Amdocs, Inc. and its members during the Class Period (the "Committee").

2.    The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Your Amdocs, Inc. 401(k) Plan, Summary Plan Description, dated February 2025 ("SPD"), at 19 ("The Plan is a defined contribution profit sharing plan with a cash or deferred arrangement under Sections 401(a) and 401(k) of the Code."); *see*

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

*also* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 5 ("The Plan is a defined contribution plan sponsored by AMDOCS, Inc. (the "Company") for the benefit of its employees. The Plan is subject to the provisions of the *Employee Retirement Income Security Act of 1974* ("ERISA").").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

4.      The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

6.    "The Restatement ... instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees ... lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.    The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

9.    Plaintiff alleges that during the putative Class Period, Defendant, as a "fiduciary" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.    At all times during the Class Period, the Plan had over half of a billion dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $608,113,526 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

11.    By 2023, the Plan had $793,515,755 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

12.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 4,731 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 5,175 participants. *See* 2023 Form 5500 for the Plan, at 2.

13.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed income fund with lower crediting rates when compared to available similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14.    Specifically, Defendants allowed substantial assets in the Plan to be invested in the Prudential Guaranteed Income Fund ("Prudential GIF"). The Prudential GIF carried significantly more risk and provided a significantly lower rate of return than other comparable funds that Defendants could have made available to Plan participants.

15.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16.    Prudential Retirement Insurance and Annuity Company ("Prudential") benefited significantly from Plan participants being invested in the Prudential GIF. The assets invested in the Prudential GIF were held and invested by Prudential, which kept the spread (the difference between the amount Prudential earned on the investments and the amount Prudential paid to Plan participants) where applicable. The crediting rates that Prudential provided to investors in the

4

Prudential GIF were/are so low that Prudential reaped a windfall on the spread. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Prudential GIF was benefiting the Prudential at the expense of Plan participants.

17.    During the putative Class Period, Defendants, as a "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

18.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

19.    Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), and failure to monitor fiduciaries (Count II).

## II.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

21.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process. Specifically, Amdocs conducts

business in Texas and has an office located at 6105 Tennyson Pkwy, Plano, Texas. *See* https://www.amdocs.com/careers/locations#230548828-2222513289.

22.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, because some or all of the acts, omissions and/or violations of ERISA giving rise to the action occurred in this District, Plaintiff Wolfe resides within this District, and Defendants reside and may be found in this District.

## III.    PARTIES

### Plaintiff

23.     Plaintiff, Veronica Wolfe ("Wolfe"), resides in Allen, Texas. During her employment, Plaintiff Wolfe participated in the Plan. Ms. Wolfe invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

24.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of her account currently, or as of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

25.     Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

### Company Defendant

26.     Amdocs, Inc. is the Plan sponsor and Plan administrator. *See* 2023 Form 5500 of the Plan, at 1; *see also* 2023 Form 5500 of the Plan, at 2 ("Plan administrator's name and address

… Same as Plan Sponsor."). "Amdocs is a leading software & services provider to the world's most successful communications and media companies."[4]

27.     During the putative Class Period, the Company is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because it had control over Plan management and/or authority or control over management or disposition of Plan assets.

28.     "The ERISA Investment Committee of the Company or its appointed investment advisors periodically review the investment results of current investment options and evaluate new investments that may be suitable for the Plan." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 9.

29.     Amdocs appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, Amdocs during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

31.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

---

[4]     *See*     https://www.amdocs.com/sites/default/files/2017-02/amdocs-2017-corporate-fact-sheet_1.pdf, last accessed on July 16, 2025.

32.    As discussed above, Amdocs appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate.

33.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS [5]

35.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Amdocs, Inc. 401(k) Plan, at any time between July __, 2019 through the date of judgment (the "Class Period").

36.    The members of the Class are so numerous that joinder of all members is impractical.  The 2023 Form 5500 lists 5,175 Plan "participants with account balances as of the end of the plan year."  2023 Form 5500 for the Plan, at 2.

37.    Plaintiff's claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants'

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.     Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.     The proper form of equitable and injunctive relief; and
>
> E.     The proper measure of monetary relief.

39.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

42.     The Plan is a defined contribution plan covering substantially all eligible employees of Amdocs. *See* SPD, at 19 ("The Plan is a defined contribution profit sharing plan with a cash or deferred arrangement under Sections 401(a) and 401(k) of the Code.") see also AmDocs, Inc. 401(k) Plan (2022 Restatement) ("Plan Doc."), at 9 ("An Employee shall become a Participant in the Plan on the first date on which the Employee is in Covered Employment.").

43.     Included in the Plan's available funds was a Guaranteed Income Fund with Prudential Retirement Insurance and Annuity Company ("Prudential") *See* Schedule H, Line 41 – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 10.

44.     At the end of 2019, $117,608,699 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 41 – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 10.

45.     By the end of 2023, $118,769,863 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 41 – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 10.

46.     The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF |
|---|---|
| 2019 | $117,608,699 |
| 2020 | $136,974,515 |
| 2021 | $134,354,125 |
| 2022 | $135,249,720 |
| 2023 | $118,769,863 |

### *Eligibility*

47.    In general, the Plan covers all employees of Amdocs. *See* SPD, at 2. ("Generally, you are eligible to participate in the Plan if you are an employee of Amdocs, Inc. or any Participating Employer.").

### *Contributions*

48.    Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 5 ("You may elect to save from 1% to 50% of your eligible pay through payroll deductions. Your contributions may be made as before-tax contributions or Roth contributions (collectively, "Elective Contributions").").

49.    Amdocs may make matching contributions to Plan accounts. *See* Plan Doc., at 12 ("[T]he Employer shall contribute for each Plan Year to the Trust Fund on behalf of each Participant eligible in accordance with Section 6.7 an amount, if any, equal to a percentage as the Sponsor in its sole discretion shall determine."); see also SPD, at 6 ("Amdocs may make a matching contribution to the Plan, in such percentage of your Elective Contributions as Amdocs, in its sole discretion, will determine.").

50.    Like other companies that sponsor 401(k) plans for their employees, Amdocs enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

51.    Amdocs also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,*  https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

52.    Given the size of the Plan, Amdocs likely enjoyed a significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

53.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

54.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

55.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

56.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

57.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

58.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

59.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

60.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

61.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

62.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

63.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

64.     Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes g(and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendant prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

65.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

66.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.      Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Prudential GIF**

14

### 1. The Plan's Inclusion of the Prudential GIF

67. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Prudential GIF.

68. Prudential established the crediting rates for the Prudential GIF with the Plan.

69. Prudential, in most cases, earns a "spread" equal to the difference between the crediting rate and the returns Prudential earns on the funds in the account.

### 2. Prudential is at a Substantial Risk of Going Insolvent

#### a. The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

70. Because a guaranteed insurance account product is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer. It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

71. A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable. It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

72. The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and

Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[8]

73.    These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

**b.    Recent Lawsuits Have Highlighted Prudential's Extreme Risk of Going Insolvent**

74.    Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

75.    A recently filed lawsuit explained that a "cursory review of [Prudential's] statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda."  *See Dempsey et al. v. Verizon Communications Inc. et al*., No. 1:24-cv-10004-AKH (S.D.N.Y. Dec. 30, 2024) at ¶ 53.

76.    The lawsuit further explained, among other things, that Prudential's surplus of $16 billion as of the end of 2023 paled in comparison to the alleged potential liabilities of $72.8 billion in affiliated party reinsurance and modified co-insurance ("Modco").  *Id.* at ¶¶ 53-54.  In other

---

[8] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

words, given the meager surplus compared to the potential liabilities put Prudential at an extreme risk of insolvency.

c.    **Empower's takeover of Prudential Did Not Alleviate the Severe Risk of Insolvency**

77.    "On April 1, 2022, [Empower Annuity Insurance Company of America] completed the acquisition of all the voting equity interests in Prudential Retirement Insurance and Annuity Company, and subsequently renamed the entity to Empower Annuity Insurance Company, as part of the acquisition of …Prudential's Full Service retirement business."  Annual Statement for the Year 2024 of Empower Annuity Insurance Company of America, Notes to Financial Statements.

78.    As noted above, available surplus is an important data point in determining an L&A carrier's insolvency risk. Based on its insufficient surplus, Prudential/Empower was/is at severe risk of insolvency.

79.    To begin, an important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | 0 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $ ) | | |
| 36.2 | shares preferred (value included in Line 30 $ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus:  $   1,018,399,778   EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $  106,414,669,390   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:        0.96%**        National Average is About **7.5%**.

80.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $ ) | | |
| 36.2 | shares preferred (value included in Line 30 $ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus:  $   26,427,441,247   EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $  218,473,153,964   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:        12.10%**        National Average is About **7.5%**.

> **d.    Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

81.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities

on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.



82.    Separate and in addition to the reserve credit reported above, Empower has also entered into a ModCo reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



83.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



84.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[9]

85.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition

---

[9]  *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity"  *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[10] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions.  *See* n. 17.

> **e.** **Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid and Affiliated Investment Concentrations**

86.     Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

87.     The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[10] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp



88.     Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

89.     In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

**3.      There are Many GICs in the Marketplace with Competitive Crediting Rates**

90.     There are other reasons besides the lack of creditworthiness why the Plan's fiduciaries should not have selected or maintained the Prudential GIF.

91.     The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

92.     Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plan but were not selected by Defendants.

Selecting investments with higher crediting rates than the Plan's investments would have directly impacted Plan participants by increasing their returns and the value of their accounts. Additionally, the higher crediting rates would have had the effect of lowering any spread being enjoyed at the expense of Plan participants by the insurance companies.

93.    The Prudential GIF in the Plan had underwhelming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[11] |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |

---

[11] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | |
|---|---|---|---|---|
| | **Amdocs 401(k) Plan** | **4,731** | **$608,113,526** | **Prudential GIF** | **2.20%** |

| | | | | | |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Amdocs 401(k) Plan** | **4,764** | **$704,202,291** | **Prudential GIF** | **1.98%** |

| | | | | | |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Amdocs 401(k) Plan** | **5,052** | **$803,121,223** | **Prudential GIF** | **1.66%** |

| | | | | |
|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Amdocs 401(k) Plan** | **5,238** | **$683,736,084** | **Prudential GIF** | **1.65%** |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |

| | | | | |
|---|---|---|---|---|
| Retirement Savings Plan | | | | |
| Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| **Amdocs 401(k) Plan** | **5,175** | **$792,771,623** | **Prudential GIF** | **1.91%** |

94.     Throughout the Class Period, the Prudential GIF in the Plan underperformed the comparator funds by an average of over 52%, as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2019 | 2.20% | 3.94% | 44.16% |
| 2020 | 1.98% | 3.75% | 47.20% |
| 2021 | 1.66% | 4.19% | 60.38% |
| 2022 | 1.65% | 4.06% | 59.36% |
| 2023 | 1.91% | 3.85% | 50.39% |
| Average Underperformance during Class Period | | 52.30% | |

95.     In short, because the Plan held between $608 million and $803 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

96.     A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from Prudential/Empower and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

97.    By selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

98.    With the massive amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[12]

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committee)

99.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

100.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

101.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

---

[12] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

102.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

103.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

104.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in her Prayer for Relief.

105.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

### COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

106.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

107.    Amdocs (the "Monitoring Defendant"), had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee had critical responsibilities as fiduciaries of the Plan.

108.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

109.    The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

110.    The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

111.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

112.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in her Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment

of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

     I.        An award of pre-judgment interest;

     J.        An award of costs pursuant to 29 U.S.C. § 1132(g);

     K.        An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

     L.        Such other and further relief as the Court deems equitable and just.

Dated: August 13, 2025              Respectfully submitted,

**WARD + WHITE PLLC**
*Daniel L. White*
Daniel L. White, Esquire
TX Attorney ID #24090588
114 ½ E. Louisianna Street
Suite 206
McKinney, TX  75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 941-0040

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
James A. Maro, Esquire
PA Attorney ID #86420
(*Admissions Pro Hac Vice to be Requested*)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
       jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*